UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

NORTHERN DIVISION



FILED
AUG 3 0 2017

| | |
|---|---|
| LAURA ZYLSTRA KAISER,<br><br>Plaintiff,<br><br>vs.<br><br>BRYAN GORTMAKER, IN HIS OFFICIAL CAPACITY AS SOUTH DAKOTA DIRECTOR OF THE DIVISION OF CRIMINAL INVESTIGATION; AND MARK BLACK,<br><br>Defendants. | 1:15-CV-01030-CBK<br><br>OPINION AND ORDER |

The plaintiff, Laura Kaiser, filed her First Amended Complaint with the Court alleging: reprisal and sex discrimination in violation of Title VII of the Civil Rights Act of 1964; reprisal and sex discrimination in violation of the South Dakota Human Relations Act of 1972; and tortious interference. Defendant Bryan Gortmaker, in his official capacity as the South Dakota Director of the Division of Criminal Investigation, has made a motion for summary judgment on the plaintiff's reprisal and sex discrimination claims in violation of federal and state law. The defendant also requests the Court to conclude as a matter of law that the plaintiff is barred from recovering punitive damages. The Court is fully advised on the matter.

## FACTUAL BACKGROUND

On August 13, 2003, Kaiser was hired as a Special Agent and was assigned to the Drug Task Force of the South Dakota Division of Criminal Investigation ("DCI") in Aberdeen, South Dakota. Kaiser was responsible for preparing and executing search warrants, drug investigations, interrogating suspects, interviewing witnesses, and testifying in court.

Director Gortmaker has two Assistant Directors that are responsible for managing Supervisory Special Agents ("SSAs") within their assigned region. Each SSA is responsible for the agents within their region. Brian Zeeb was the Northeast SSA and Kaiser's supervisor from 2006 until he was promoted to Assistant Director in 2011. Jason Even was promoted to Zeeb's former position as the Northeast SSA in 2011. The DCI agents are stationed in a basement office in the Brown County facility. The Drug Task Force is a team comprised of federal and state officers. In the fall of 2011, the office included DCI Agents Mark Black and Dave Lunzman and Brown County Investigators Damian Bahr and Ross Erickson. Jason Even supervised the DCI agents and Brown County Sheriff Mark Milbrandt supervised Erickson and Bahr.

Kaiser alleges she was subject to disparate treatment while she was training at the academy. Kaiser reported to Gortmaker that the men would call her "Ellen," in reference to Ellen DeGeneres. Moreover, she reported to Zeeb that her lab instructor said, "We're going to strip you down and take turns washing you down," after meth was splattered on her. Finally, while at the academy, Kaiser reported to Zeeb that a detective made romantic advances and "almost stalked her" after she said she was not interested.

In 2005, Kaiser reported to Zeeb that Brown County Investigator Bryan Locke was harassing her. Locke made numerous comments that Kaiser found inappropriate, such as telling her she would be assigned to search a kitchen because that is where women belong, asking if she wanted a recipe he found in a search, and telling Kaiser the only reason an informant spoke to her was because of her "boobs." Zeeb arranged for Kaiser to confront Locke in front of himself and Milbrandt. When Kaiser later reported she felt she was being retaliated against, Zeeb told her that if the issue "gets back to Pierre, you better be ready to bend over and take it" and she needed to "eat the shit sandwich." Zeeb held a "coaching session" to let her know that, should

2

she want a promotion or transfer in the future, others may see her complaint as an inability to get along with others. In response, Kaiser was required to double her case numbers.

For eight years, Kaiser received positive performance reviews. In January 2011, she was promoted to Special Agent III, the highest level for that position. In her 2011 mid-year evaluation, Kaiser was praised for her exceptional work product, ability to work amicably with others, relentless work, and above-average case activity. In July 2011, Kaiser was appointed to serve as the acting supervisor for the Northeast DCI agents while her supervisor was on vacation.

In August 2011, Brown County Deputy Ross Erickson was assigned to the Drug Task Force in Aberdeen, South Dakota. Kaiser alleges that Erickson immediately established a custom of making sexually explicit comments to her. Plaintiff alleges she wanted to make a harassment complaint, but feared she would be adversely affected because she had a negative experience when she made the harassment complaint in 2005.

On October 17, 2011, Kaiser asked fellow coworker, Jessica Page, for advice. Page advised Kaiser to not file a complaint because it would only cause problems. Later that day, Kaiser informed Mark Black about Erickson's conduct. Black offered to speak with Erickson, but Kaiser declined. Kaiser requested that Black keep her concerns confidential, and Black gave her the impression that he would.

The following day, Kaiser approached Erickson about the sexually inappropriate comments and questions. Erickson apologized and said he would stop being inappropriate in the future. On October 20, 2011, Erickson informed Kaiser that Black had told the entire office about the issue. Kaiser apologized and said it was not her intent to have the office know about the incident. Later that day, Kaiser approached Black and asked why he shared her conversation

3

with the rest of the office. Black attempted to shift the blame on Kaiser and began ignoring her at work.

Later that afternoon, Black secretly assembled a meeting with Erickson, Bahr, and Lunzman at Melgaard Park in Aberdeen, South Dakota. Black Dep. 35, Lunzman Dep. 19. At the park, Erickson admitted to making some of the statements and acknowledged they could be construed as sexual harassment, but claimed they were taken out of context. Black stated that Kaiser was using the information to test their friendship. Plaintiff alleges that Black conspired with Erickson, Bahr, and Lunzman to formulate a set of talking points in an effort to have her removed from the department or be fired. Kaiser claims the group agreed they would all tell supervisor, Jason Even, that Kaiser was not to be trusted, was unpleasant to work with, and was mentally ill. After the meeting at Melgaard Park, Black called Even to report a hostile work environment. Black relayed some of Erickson's comments, which Even found concerning and inappropriate.

On October 20, 2011, Even called Satterlee about the situation. Satterlee instructed Even to "get to the bottom" of it. This was the first time Satterlee had directed a subordinate to conduct a workplace investigation. Even called Milbrandt as a courtesy to let him know he would be speaking with the sheriff's deputies and apologized for the turmoil.

On October 21, 2011, Even interviewed Black, Erickson, Bahr, and Lunzman regarding Kaiser's complaint. Plaintiff alleges that Black, Erickson, Bahr, and Lunzman all followed their plan to disparage her. Afterward, Even met with Kaiser and accused her of fabricating her allegations and threatened the issue could result in her termination. Kaiser denied such allegations and told Even that Erickson had acknowledged his behavior and apologized. Even was still skeptical of Kaiser and informed her that he was not satisfied with her work product and

4

performance. Gortmaker conceded that Erickson's conduct qualified as harassment under DCI policy. Gortmaker Dep. 24, 25.

Satterlee contacted Southeast SSA Leuning and directed him to go to Aberdeen to investigate Kaiser's relationship with the agents and task force members. Leuning was not directed to investigate sexual harassment; he was told to investigate Kaiser. Leuning asked the interviewees about Kaiser's work quality, case levels, whether they could have a relationship with her, whether they were aware of recordings, and if they could trust her in the future. When Leuning interviewed Milbrandt, he raised Kaiser's situation with Locke, told Leuning he did not want her stationed in Aberdeen, and gave Leuning the impression that he did not like Kaiser.

On November 4, 2011, Kaiser was put on a thirty-day work improvement plan ("WIP") because she failed to maintain satisfactory relationships with her coworkers and supervisors, was a disruptive influence in the office, produced unsatisfactory work products, and failed to provide leadership. Kaiser was given nine tasks to complete the WIP. One of her tasks was to rebuild positive relationships with coworkers, supervisors, and managers. When Kaiser attempted to rebuild her relationship with Black, he responded, "We are done. Don't ever approach me again."

On December 8, 2011, Assistant Director Dan Satterlee informed Kaiser she met the WIP's requirements with one exception; she had failed to rebuild positive relationships with her coworkers, supervisors, and managers. Kaiser was demoted to Special Agent II and was involuntarily transferred to the Medicaid Fraud Control Unit in Pierre, South Dakota, effective January 3, 2012.

Kaiser filed a grievance regarding her demotion, transfer, and treatment on December 12, 2011. On December 27, 2011, Kaiser reported sexual harassment and retaliation to then Brown

County State's Attorney, Kim Dorsett. The next day, Kaiser filed a formal grievance with the Director of the South Dakota Division of Criminal Investigation, Bryan Gortmaker. Kaiser also contacted South Dakota Attorney General Marty Jackley on December 28, 2011, to alert him to the facts and request that he stay the order of transfer.

Kaiser began her employment in Pierre, South Dakota, on January 3, 2012. Kaiser's grievance was denied on January 9, 2012. In response, Kaiser contacted the Equal Employment Opportunity Commission ("EEOC") in January 2012 to file a "charge of discrimination." Kaiser believes DCI began providing negative references about her to potential employers in retaliation. Plaintiff officially filed a grievance with Attorney General Jackley that was denied on February 23, 2012.

On April 16, 2012, Kaiser was informed she would not be allowed to live in the Pierre law enforcement dormitory after September 1, 2012. In addition, Kaiser would not be receiving her per diem, compensation for travel time, and an ability to use a state vehicle to commute beginning on June 1, 2012. On May 8, 2012, Kaiser alleges she was constructively discharged. She e-mailed DCI that she had no choice but to resign and that her last day would be May 18, 2012. Kaiser received a letter accepting her offer of resignation and suspending her from pay until her resignation date.

Plaintiff alleges DCI has since prevented her from obtaining numerous positions of employment, including with the Department of Social Services, Department of Corrections, Department of Labor and Relations, and private employers, by providing negative references and misrepresentations about her employment, demotion, discharge, and performance.

Defendant Gortmaker has filed a motion (Doc. 58) for summary judgment in his favor on the plaintiff's sex and reprisal discrimination claims under federal and state law.

## STANDARD OF REVIEW

The standard of review for summary judgment motions is well established. Plaintiff argues, "summary judgment should seldom be granted in discrimination cases, and is proper only where the evidence could not support any reasonable inference of discrimination." Pl.'s Resp. in Opp. to Def.'s Mot. for Summ. J., p. 15. Plaintiff misstates the law in this regard. The United States Supreme Court has reiterated that district courts should "not treat discrimination differently from other ultimate questions of fact." Torgerson v. City of Rochester, 643 F.3d 1031, 1043 (8th Cir. 2011) (*citing* Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 148 (2000)). The Court has also stated: "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed "to secure the just, speedy and inexpensive determination of every action." Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986) (*quoting* Fed. R. Civ. P. 1). Therefore, "[t]here is no 'discrimination case exception' to the application of summary judgment . . .' " Torgerson, 643 F.3d at 1043 (*citing* Fercello v. County of Ramsey, 612 F.3d 1069, 1077 (8th Cir. 2010)).

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court views the evidence in the light most favorable to the nonmoving party and draws all reasonable inferences from that evidence in favor of the nonmoving party. Smith v. URS Corp., 803 F.3d 964, 968 (8th Cir. 2015) (*citing* Moody v. Vozel, 771 F.3d 1093, 1096 (8th Cir. 2014)). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of the judge." Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011); Reeves v. Sanderson Plumbing Prods., Inc.,

7

530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 206 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Id. (*quoting* Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

## ANALYSIS

### I. Reprisal Discrimination in Violation of Title VII

Title VII prohibits employers from "discriminat[ing] against any of his employees . . . because [s]he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3. Kaiser must provide "either direct evidence of discrimination or create an inference of it under the *McDonnell Douglas* burden-shifting framework to defeat the defendant's motion for summary judgment on [her] retaliation claim." Lors v. Dean, 746 F.3d 857, 865 (8th Cir. 2014). "Direct evidence of retaliation is evidence that demonstrates a specific link between a materially adverse action and the protected conduct, sufficient to support a finding by a reasonable fact finder that the harmful adverse action was in retaliation for the protected conduct." Id. (*quoting* Griffith v. City of Des Moines, 387 F.3d 733, 736 (8th Cir. 2004)). The plaintiff fails to assert the presence of direct evidence to support an inference of retaliation, but rather, argues the presence of an inference of retaliation under the *McDonnell Douglas* burden-shifting framework.

Under the *McDonnell Douglas* framework, "the initial burden is on the plaintiff to establish a *prima facie* case, consisting of evidence: (1) that he or she engaged in [a] statutorily protected activity; (2) an adverse employment action was taken against him or her; and (3) a

8

causal connection exists between the two events." Green v. Franklin Nat'l Bank of Minneapolis, 459 F.3d 903, 914 (8th Cir. 2006). If the plaintiff established a *prima facie* case, the burden then shifts to the defendant to show a "non-retaliatory reason for the adverse employment action." Lors, 746 F.3d at 867. "If the defendant can show a legitimate, non-retaliatory reason for its actions, the burden returns to the plaintiff who is then obliged to present evidence that (1) creates a question of fact as to whether the defendant's reason was pretextual and (2) creates a reasonable inference that the defendant acted in retaliation." Id.

The issue is whether the plaintiff has established a *prima facie* case of reprisal discrimination. First, "Employers may not retaliate against employees who 'oppose discriminatory conduct.' " Ogden v. Wax Works, Inc., 214 F.3d 999, 1007 (8th Cir. 2000) (*citing* 42 U.S.C. § 2000e(a). In *Ogden*, the plaintiff engaged in a statutorily protected activity "when she told [her harasser] to stop his offensive behavior." Id. Here, plaintiff engaged in a statutorily protected activity when she confronted Erickson to stop his harassment on October 18 and reported the conduct to Even during her meeting on October 21. Therefore, the plaintiff has made an adequate showing that she engaged in a statutorily protected activity.

The next question is whether the plaintiff suffered from an adverse employment action. An employer's retaliatory act is actionable when it would "dissuade a reasonable worker from making or supporting a charge of discrimination." Burlington N. & Santa Fe Ry. Co v. White, 548 U.S. 53, 57 (2006). When considering this analysis, courts must consider the actions from the perspective of a reasonable person in the plaintiff's position, considering "all the circumstances." Id. (*quoting* Oncale v. Sundowner Offshore Svcs., Inc., 523 U.S. 75, 81 (1998)). There is no dispute that Kaiser suffered a series of adverse employment actions. First, she was placed on a work improvement plan, demoted, and transferred to Pierre to work for the Medicaid

9

Fraud division. After filing an EEOC charge, she was disallowed the necessary benefits that allowed her to continue working in Pierre, which resulted in her constructive discharge. The defendant does not dispute the plaintiff experienced several adverse employment actions. Therefore, the second element necessary to establish a *prima facie* case of retaliation has been fulfilled.

Lastly, the plaintiff must demonstrate that the adverse employment actions were caused by her protected activity. "Proximity alone can be enough to establish causation for a *prima facie* case." Gibson v. Geithner, 776 F.3d 536, 541 (8th Cir. 2015). "An employee who alleges status-based discrimination under Title VII need not show that the causal link between injury and wrong is so close that the injury would not have occurred but for the act." Univ. of Texas Sw. Med. Ctr. v. Nassar, 133 S.Ct. 2517, 2522-3 (2013). " It suffices instead to show that the motive to discriminate was one of the employer's motives, even if the employer also had other, lawful motives that were causative in the employer's decision." Id. at 2523. When Kaiser informed Even about Erickson's conduct, he accused her of fabricating her allegations and threatened the issue could result in her termination. Kaiser was then put on a work improvement plan on November 4, 2011. On December 8, 2011, Kaiser was demoted to Special Agent II, involuntarily transferred to Pierre, and reassigned to the Medicaid Fraud Unit, effective January, 3, 2012. On April 16, 2012, the plaintiff was informed she would no longer be allowed to live in the Pierre Dormitory after September 1, 2012. In addition, she would no longer be receiving her per diem, compensation for travel time, and an ability to use a state vehicle to commute, effective June 1, 2012. On May 8, 2012, Kaiser alleges to have been constructively discharged. Before Kaiser reported Erickson's behavior to Even, Kaiser had consistently received good performance reviews. A reasonable finder of fact could find that informing Even about her

10

confrontation with Erickson was causally connected to her adverse employment actions. Therefore, the plaintiff has established a *prima facie* case for retaliation.

Next, the *McDonnell Douglas* test shifts the burden to the employer to provide a "non-retaliatory reason for the adverse employment action." Lors, 746 F.3d at 867. Gortmaker asserts Kaiser's work quality, caseload, and relationships with her coworkers were unacceptable. If the employer acted as result of the plaintiff's performance, that would be a legitimate non-retaliatory reason for the adverse employment action.

Finally, the *McDonnell Douglas* framework shifts the burden back to the plaintiff to show the employer's explanation for the adverse employment actions are merely pretextual. Pretext is proven either directly by persuading the court that a discriminatory reason more likely motivated the employer, or indirectly by showing that the employer's proffered explanation is unworthy of credence. Pye v. Nu Aire, Inc., 641 F.3d 1011, 1021 (8th Cir. 2011). It is more likely that the Employer was motivated by discriminatory reasons given Kaiser's evaluation months prior and her recent promotion. DCI's harsh approach to Kaiser's alleged relationship issues is also an indication of pretext. Kaiser was expected to complete a nine-task WIP in 30 days, when a male placed on a WIP was given 60 days for only three tasks. More significantly, the plaintiff is the only agent ever transferred involuntarily. A reasonable finder of fact could find the employer was motivated by Kaiser's confrontation with Erickson and the potential liability that came along with Erickson's conduct. Therefore, the plaintiff has established there is a genuine issue of material fact as to whether the employer retaliated against her in response to her opposing Erickson's conduct.

## II. Hostile Work Environment in Violation of Title VII

Title VII also protects employees from being subjected to a hostile work environment as a result of sexual harassment. Sexual harassment can be a form of sex discrimination prohibited by 42 U.S.C. § 2000e-2(a)(1). To establish the elements of a claim for coworker sexual harassment, a plaintiff must demonstrate: "(1) she was a member of a protected group; (2) unwelcome harassment occurred; (3) a causal nexus between the harassment and her membership in the protected group; (4) that the harassment affected a term, condition, or privilege of employment; and (5) that the employer knew or should have known of the harassment and failed to take prompt and effected remedial action." Anda v. Wickes Furniture Co, 517 F.3d 526, 531 (8th Cir. 2008). "Employer liability can be imposed when the harassment is committed by coworkers or by third parties." Lapka v. Chertoff, 517 F.3d 974, 984 n. 2 (7th Cir. 2008). It is necessary for employees to inform their employers of behavior they find objectionable before they can seek to hold an employer responsible for failure to correct the behavior in question. Whitmore v. O'Connor MGMT, Inc., 156 F.3d. 796 (8th Cir. 1998). Kaiser agrees she confronted Erickson on October 18, 2011 and that he never harassed her after that date. Kaiser also agrees that DCI supervisors were not aware of her complaints concerning Erickson prior to October 20, 2011, when Black called Even. The Eighth Circuit has reiterated that in order to establish employer liability for harassment by a coworker, a plaintiff must establish that the employer "knew or should have known of the conduct and failed to take proper remedial action." Dhyne v. Meiners Thriftway, Inc., 184 F.3d 983, 987 (8th Cir. 1999). The plaintiff is unable to provide evidence that DCI knew or should have known of Erickson's specific comments and questions directed at Kaiser. Because the plaintiff is unable to provide

12

such evidence, she is unable to establish a *prima facie* case for discrimination based on a hostile work environment as a result of sexual harassment.

## III. Sex Discrimination in Violation of Title VII

Title VII prohibits discrimination with respect to an individual's compensation, terms, conditions, or privileges of employment because of such individual's sex. 42 U.S.C. § 2000e-2(a)(1). Kaiser argues that she was placed on a WIP, demoted, transferred, and constructively discharged because of her sex. An employee's Title VII claim for sex discrimination can survive summary judgment in one of two ways. To make a *prima facie* case under the *McDonnell Douglas* framework, the plaintiff must show: "(1) she was a member of the protected group; (2) she was qualified to perform the job; (3) she suffered an adverse employment action; and (4) circumstances permit an inference of discrimination." Lewis v. Heartland Inns of Am., L.L.C., 591 F.3d 1033, 1038 (8th Cir. 2010). Such a showing creates a presumption of unlawful discrimination, requiring the defendant to produce a "legitimate nondiscriminatory reason for its employment action." Id. The burden then returns to the plaintiff to prove the defendant's reason for firing her is pretextual. Id.

Gortmaker does not dispute that the plaintiff is a member of a protected group, that she was qualified to perform the job, and that she suffered an adverse employment action. The only issue for the plaintiff to establish a *prima facie* case for sex discrimination is to show circumstances that permit an inference of discrimination. "Because the required showing for a *prima facie* case is a 'flexible evidentiary standard,' a plaintiff can establish an inference of discrimination to satisfy the fourth element 'in a variety of ways, such as by showing more-favorable treatment of similarly-situated employees who are not in the protected class, by showing biased comments by a decisionmaker.' " Grant v. City of Blytheville, Arkansas, 841

13

F.3d 767, 774 (8th Cir. 2016) (*quoting* Pye v. Nu Aire, Inc., 641 F.3d 1011, 1019 (8th Cir. 2011). Plaintiff argues that males are treated significantly more favorably, especially when it came to work improvement plans. Although Even had concerns about Black's role in the dispute and his work product, DCI declined to investigate him, place him on a work improvement plan, or discipline him. Moreover, DCI treated Kaiser harsher than any other male employee that was placed on a work improvement plan. Kasier was given three times the tasks and half the time to complete them. DCI's investigation attempts to justify Kaiser's demotion and transfer because she was unable to rebuild her relationships with her coworkers. Kaiser was the only DCI employee who has ever been involuntarily transferred. Finally, DCI hired a man to replace Kaiser. A reasonable fact finder could find an inference of discrimination by way of more-favorable treatment of similarly- situated employees who are not in the protected group. Therefore, the plaintiff has established a *prima facie* case of sex discrimination.

DCI's stated reason for demoting and transferring Kaiser was that she failed to meet one of the objectives of her WIP: rebuilding relationships. What if co-workers refuse to rebuild relationships? DCI has attempted to allow other employees to determine Kaiser's fate. This is not to be permitted. This could be called a "pass the buck" policy. DCI recognizes there is ample testimony reflecting Kaiser's genuine attempts to improve the relationships with her coworkers. Despite Kaiser's many attempts to fulfill the requirements of her WIP, she was nonetheless demoted and transferred against her will. No other male agent has ever been transferred against his will. A common method of proving pretext is "to show that it was not the employer's policy or practice to respond to such problems in the way it responded in the plaintiff's case." Erickson v. Farmland Indus., Inc., 271 F.3d 718, 727 (8th Cir. 2001). The plaintiff has established that DCI's response was inconsistent with its policy and general

14

practices. Therefore, the plaintiff has created a genuine issue of material fact as to whether DCI's reasons for its adverse employment actions against Kaiser were mere pretext. The motion for summary judgment on the plaintiff's sex discrimination claim is denied.

## IV. Failure to Exhaust Administrative Remedies on State Claims

The South Dakota Human Relations Act of 1972 makes it an unfair or discriminatory practice to engage in any reprisal, economic or otherwise, against a person by reason of his or her protected activity. SDCL § 20-13-10. The South Dakota Human Relations Act of 1972 also makes it an unfair or discriminatory practice to discharge an employee or refuse to hire an applicant because of sex. SDCL § 20-13-10. The defendant asserts the plaintiff has failed to exhaust her administrative remedies to bring reprisal and sex discrimination claims pursuant to the South Dakota Human Relations Act. The plaintiff fails to address the issue in her brief in opposition. "Exhaustion of remedies is broadly stated as the withholding of judicial relief on a cliam or dispute cognizable by an administrative body until the administrative process has run its course." Tombollo v. Dunn, 342 N.W.2d 23, 25 (S.D. 1984) (*quoting* Gottschalk v. Hegg, 228 N.W.2d 640, 642 (S.D. 1975)). "SDCL Ch. 20-13 provides a comprehensive format for investigating, delineating, and acting on sexual discrimination cases." Id. The plaintiff in not permitted to simply assert a claim based on the South Dakota Human Relations Act in this federal action without complying with and exhausting the administrative requirements and remedies. It was necessary for the plaintiff to seek a determination from the South Dakota Human Rights Commission and appeal its decision in order for the plaintiff to have exhausted her administrative remedies. *See* Tombollo, 342 N.W.2d at 25. Therefore, the defendant's motion for summary judgment regarding the plaintiff's sex and reprisal discrimination claims pursuant to the South Dakota Relations Act of 1972 should be granted.

15

Finally, the plaintiff's arguments regarding punitive damages are now deemed as moot because the plaintiff was seeking punitive damages in connection with her state claims. Because the Court is dismissing her state claims, punitive damages are no longer an issue for consideration. The plaintiff is barred from recovering punitive damages in this case.

**ORDER**

Now, therefore,

IT IS ORDERED:

1. The plaintiff's motion, Doc. 70, requesting oral argument pursuant to Local Rule 7.1(c), is denied.

2. The defendant's motion, Doc. 58, for summary judgment on the plaintiff's sex and reprisal discrimination claims pursuant to Title VII of the Civil Rights Act of 1964, is denied.

3. The defendant's motion, Doc. 58, for summary judgment on the plaintiff's sex and reprisal discrimination claims in violation of the South Dakota Human Relations Act of 1972, as well as the plaintiff's hostile work environment as a result of sexual harassment in violation of Title VII of the Civil Rights Act of 1964, is granted.

DATED this 30th day of August, 2017.

BY THE COURT:

CHARLES B. KORNMANN
United States District Judge